IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| WESLEY DAVIDSON, | : | Case No. 1:15-cv-00528 |
| Plaintiff, | : | Judge Susan J. Dlott |
| v. | : | **ORDER DENYING PLAINTIFF'S MOTION FOR NEW TRIAL** |
| CSX TRANSPORTATION, INC., | : | |
| Defendant. | : | |

This matter is before the Court on Plaintiff's Motion for New Trial (Docs. 67, 73), which Defendant opposes (Doc. 71).[1] For the reasons that follow, Plaintiff's Motion will be DENIED.

## I. BACKGROUND

On June 14, 2017, in this civil action alleging a violation of the Federal Employers' Liability Act, 45 U.S.C. § 51, a jury returned a verdict in favor of Plaintiff Wesley Davidson and against Defendant CSX Transportation, Inc. ("CSXT"). (Doc. 65.) Answering a short series of interrogatories, the jury found: (1) CSXT failed to provide Mr. Davidson with a reasonably safe place in which to work and this failure caused or contributed to his injuries; (2) Mr. Davidson failed to exercise reasonable care for his own safety and his failure also caused or contributed to his injuries; and (3) expressed as a percentage, CSXT was 20% at fault and Mr. Davidson was 80% at fault. (*Id.* at PageID 447.) The jury also determined that Mr. Davidson had suffered $39,500 in damages, $37,500 for after-tax lost wages and $2,000 for the pain and suffering he endured as a result of his injuries. (*Id.* at PageID 448.) Based on the jury's finding with respect

---

[1] Plaintiff's memorandum brief in support of his Motion was filed as a separate pleading (Doc. 68), and then supplemented with record citations after a partial transcript of the trial proceedings was prepared (Doc. 73). Plaintiff did not file a reply.

1

to contributory negligence, a judgment for damages in the amount of $7,900 ($39,500 x 20% = $7,900) was entered in Mr. Davidson's favor. (Doc. 66.)

Plaintiff's Motion for New Trial (Doc. 67) was timely filed and is ripe for this Court's consideration.

## II. STANDARD OF REVIEW

"The court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). Courts generally interpret Rule 59(a) to warrant a new trial when the jury has reached a "'seriously erroneous result,' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1045–46 (6th Cir. 1996). Whether to grant a new trial is within the trial court's discretion. *Anchor v. O'Toole*, 94 F.3d 1014, 1021 (6th Cir. 1996). The governing principle in a court's consideration of a Rule 59(a) motion "is whether, in the judgment of the trial judge, such course is required in order to prevent an injustice; and where an injustice will otherwise result, the trial judge has the duty as well as the power to order a new trial." *Park W. Galleries, Inc. v. Hochman*, 692 F.3d 539, 544 (6th Cir. 2012) (quotation and citation omitted).

## III. ANALYSIS

Plaintiff seeks a new trial, claiming that the jury's award for pain and suffering is "shockingly inadequate" and therefore "a miscarriage of justice" and that the jury's apportionment of fault is against the weight of the evidence. (Doc. 67 at PageID 451.) The Court disagrees, strongly, with each premise.

2

## A. Pain and Suffering Award

As a general matter, "courts are reluctant to overturn jury verdicts on the grounds of excessive or **inadequate** damages." *Bruner v. Dunaway*, 684 F.2d 422, 427 (6th Cir. 1982) (citing *Cross v. Thomson*, 298 F.2d 186 (6th Cir. 1962)) (emphasis added). "The assessment of damages in a case tried before a jury is peculiarly the function of the jury." *Pohrybienyk v. Kirchner*, 410 F.2d 1114, 1115 (6th Cir. 1969). This includes "the value of pain and suffering." *Id.* (quotation and citation omitted). There is no "measuring stick" to assess the value of pain and suffering, which is left "to the sound judgment of the jury." *Id.* at 1115–16 (quotation and citation omitted). Only the "gross abuse" of the jury's discretion permits a court to substitute its judgment for that of the jury. *Id.* at 1115 (quotation and citation omitted).

At trial, the jury learned that Mr. Davidson was—and remains—a conductor in freight service at CSXT. (Doc. 69 at PageID 469–70 (3:19–4:7).) On Friday, October 17, 2014, working the Y-126 job, he injured his shoulders while "switching" Drumm Industries. (*Id.* at PageID 472–73 (6:1–7:9).) Mr. Davidson and his engineer were shoving a "cut" of eight or nine tank cars. (*Id.* at PageID 479 (13:11–25).) As conductor, Mr. Davidson was riding the shoving platform and was on the "lead end of the move." (*Id.* at PageID 479 (13:7–25).) Riding the locomotive at the other end of the shove was engineer Steve Comer.[2] (*Id.* at PageID 472 (6:10–11), 480 (14:18–25).) Mr. Davidson, facing forward, controlled the move by giving his engineer "car counts." (*Id.* at PageID 480 (14:2–6, 21–25).)

When the shove began, Mr. Davidson stood in the center of the cab holding onto the rails. (*Id.* at PageID 482 (16:21–25), 484 (18:2–19).) As they approached the curve, he testified that he moved to the side of the cab because his line of sight "was restricted from the vegetation." (*Id.* at PageID 482–83 (16:25–17:4).) They hit "a real bad spot" of track that caused the cab to

---

[2] Mr. Davidson's "regular" engineer was on vacation that week. (Doc. 69 at PageID 472 (6:10–14).)

jerk back and forth, throwing him forward and then back. (*Id.* at PageID 483 (17:15–18).) Mr. Davidson felt pain first in his right shoulder, then in his left. (*Id.* at PageID 483 (17:15–20).) He "took inventory of what [he] was feeling" and "continued with the move." (*Id.* at PageID 483 (17:21–23).) Mr. Davidson did not tell his engineer about his injuries until after he switched the cars out. (*Id.* at PageID 506 (40:8–15), 532 (66:4–18).) When he returned to the yard, he completed his paperwork and "pondered [his] options for 20 minutes or so." (*Id.* at PageID 507 (41:21–24).) He reported his injury to his immediate supervisor and filled out an accident report. (*Id.* at PageID 509–10 (43:6–44:6).) Mr. Davidson was off the following Saturday and Sunday, and he worked two days of light duty to see if additional rest would ease his discomfort. (*Id.* at PageID 511–12 (45:23–46:21).) He called his doctor on Tuesday and took the first available appointment on Thursday. (*Id.* at PageID 512–13 (46:22–47:1).) On Wednesday, Mr. Davidson reported to work, but a trainee did all the physical labor.[3] (*Id.* at PageID 513 (47:8–20).)

An insurance mix-up prevented Mr. Davidson from receiving treatment on Thursday, but, the next day, Friday, he received injections in both shoulders. (*Id.* at PageID 514 (48:2–21).) He was referred to Anthony Checroun, M.D., an orthopaedic surgeon whose specialty is shoulders. (Checroun Dep., Doc. 40-1 at PageID 227 (5:12–14), 260 (38:2–3).)[4] Dr. Checroun diagnosed Mr. Davidson with a superior labrum anterior posterior ("SLAP") tear in his right shoulder and performed surgery on November 12, 2014. (*Id.* at PageID 232 (10:7–10), 234 (12:13–16); Doc. 69 at PageID 515 (49:12–24).) For the first 30 days thereafter, Mr. Davidson had to keep his arm immobilized. (Doc. 69 at PageID 516 (50:8–12).) He slept on a recliner at night, had to cover his sling when he showered, and, because he was right-handed, had to give extra thought to everyday tasks such as "[o]pening up a jar" or "[g]oing to the restroom." (*Id.* at PageID 516

---

[3] "I said as long as I got somebody working with me where I don't have to do nothing, I'll come in and go to my doctor's appointment on Thursday." (Doc. 69 at PageID 513 (47:16–18).)
[4] Dr. Checroun testified at trial by video deposition.

4

(50:13–17), 518 (52:2–11).) After two-and-a-half months of "hard" physical therapy, Mr. Davidson returned to work on February 16, 2015 with no restrictions. (*Id.* at PageID 516 (50:1–7), 517 (51:18–23); Checroun Dep., Doc. 40-1 at PageID 257 (35:8–24); Defendant's Exh. 1009.) Mr. Davidson testified that he was "happy" with his surgeon who "did a great job." (Doc. 69 at PageID 517 (51:16–17).) On direct examination, when asked if his right shoulder was better, he replied, "Absolutely." (*Id.* at PageID 518 (52:14–15).)

Mr. Davidson consulted with Dr. Checroun about his left shoulder on April 21, 2015. (Checroun Dep., Doc. 40-1 at PageID 243 (21:11–16).) Although he complained of his left shoulder hurting him near the biceps area, Mr. Davidson told Dr. Checroun that it was "more of a nuisance than a lot of pain." (*Id.* at PageID 243–44 (21:17–22:20), 257–58 (35:19–36:12).) Dr. Checroun ordered an MRI, which revealed both a SLAP and rotator cuff tear. (*Id.* at PageID 244–46 (22:17–24:16).) Mr. Davidson decided against surgery at that time. (Doc. 69 at PageID 519 (53:3–13).) But he returned on December 15, 2015, some seven months later, because, according to Dr. Checroun's notes, "a lot of lifting at work" was causing more pain in his left shoulder. (Checroun Dep., Doc. 40-1 at PageID 247–48 (25:17–26:10).) Dr. Checroun performed a second surgery on December 28, 2015, and Mr. Davidson returned to work on April 11, 2016 with no restrictions. (*Id.* at PageID 248 (26:11–15), 251 (29:9–20); Plaintiff's Exh. 9; Doc. 69 at PageID 519–20 (53:23–54:3).) Regarding another "painful" rehab, Mr. Davidson allowed that he was "[n]ot looking forward to it," but stated simply, "I did it." (Doc. 69 at PageID 520 (54:6–19).) When asked whether his second surgery produced a good result, Mr. Davidson again answered, "Absolutely." (*Id.* at PageID 520 (54:4–5).)

The Court, of course, along with the jury, observed Mr. Davidson testify. His answers were distinctly to the point. He described his first post-surgery rehab as "hard" without further

5

embellishment. When asked how he coped without the use of his right hand, Mr. Davidson matter-of-factly testified, "You learn to use your left. Do the best you can." (*Id.* at PageID 518 (52:4–6).) Regarding his second surgery, his responses suggested the event was almost routine. He praised his surgeon. He even praised his supervisor. (*Id.* at PageID 504 (38:16) ("Mr. Parsons is a good guy and a very good boss.").)

Obviously the jury could have awarded Mr. Davidson more for his pain and suffering. But, under the circumstances of what the jury quite reasonably perceived to be a happy ending, it did not.[5] There was no "gross abuse" of jury discretion. *Pohrybienyk*, 410 F.2d at 1115. Accordingly, the Court will not grant Plaintiff's Rule 59(c) Motion on this basis.

### B. Apportionment of Fault

When a court "is of the opinion that the verdict is against the clear weight of the evidence," it may set aside the verdict. *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 383 (6th Cir. 2008) (quotation and citation omitted). But a new trial may be granted on this basis *only* if the verdict was "unreasonable." *Id.* "[I]f a reasonable juror could reach the challenged verdict, a new trial is improper." *Nolan v. Memphis City Schs.*, 589 F.3d 257, 264 (6th Cir. 2009) (quotation and citation omitted). A verdict is not unreasonable "because other results are *more* reasonable." *Id.* (citation omitted) (emphasis added).

Plaintiff's counsel argues that the jury's apportionment of fault, finding Mr. Davidson 80% (and CSXT only 20%) responsible for his injuries, is contrary to the "overwhelming evidence of the railroad's culpability." (Doc. 73 at PageID 757.) Not so. Indeed, a reasonable jury could have returned a defense verdict.

---

[5] It bears repeating, *see supra* page 1, that the jury awarded Mr. Davidson the entire amount of after-tax lost wages he sought.

Mr. Davidson has worked for CSXT for 12 years. (Doc. 69 at PageID 469 (3:7–10).) Prior to the October 2014 date he injured his shoulders, he had been working the Y-126 job for a "[g]ood eight or nine, ten months." (*Id.* at PageID 472 (6:15–20), 527–28 (61:24–62:2), 532 (66:24–67:5); Defendant's Exh. 1006.) Mr. Davidson switched Drumm Industries "[d]aily,"[6] meaning he shoved cars from the CSXT main line track located in the Ivorydale Yard to the Drumm lead, and back. (Doc. 69 at PageID 473 (7:3–20), 475 (9:14–25).)

Mr. Davidson testified that he was "concerned" about the condition of the track, and identified vegetation and rotted ties as his "biggest fear." (*Id.* at PageID 502 (36:9–13).) He claimed to have reported his concerns to his immediate supervisor, Mr. Parsons, who was the industrial trainmaster at that time, at "the end of June, right before 4th of July." (*Id.* at PageID 503 (37:5–14).) When nothing happened vis-à-vis the conditions in July or August, Mr. Davidson supposedly followed up with Mr. Parsons. (*Id.* at PageID 504–05 (38:7–39:4).) In his role as conductor, he told him that "[W]e need to pull that track out of service," to which he claimed Mr. Parsons replied, "[W]e can't do that." (*Id.* at PageID 505 (39:7–24).) Mr. Parsons—with whom Mr. Davidson boasted a good relationship[7] *and* who very recently had left CSXT's employ[8]—was not called to testify at trial. His absence was conspicuous. Mr. Davidson's testimony that CSXT was on notice of what he perceived to be problems with the track and surrounding vegetation growth was uncorroborated,[9] therefore, and the jury evidently chose to discredit it.

---

[6] Mr. Davidson testified, "Every once in a while they wouldn't get switched if they weren't ready for us, but 99 percent of the time it was every day." (Doc. 69 at PageID 473 (7:7–9).)
[7] *See supra* page 6 and *infra* page 10.
[8] (Doc. 70 at PageID 611–14 (53:17–56:11).)
[9] In October 2014, David Hamby was CSXT's Louisville Division Manager (located in Cincinnati, Ohio). (Doc. 70 at PageID 561–62 (3:13–4:2).) As division manager, he supervised transportation (as opposed to track) employees. (*Id.* at PageID 561 (3:13–15).) Jimmy Spencer, terminal superintendent, was his direct report, and Mr. Parsons reported directly to Mr. Spencer. (*Id.* at PageID 563 (5:1–7).) Mr. Hamby had direct contact with both Mr. Spencer and Mr. Parsons on his morning calls. (*Id.* at PageID 563 (5:18–25).) He denied ever being told that any employee,

7

Other evidence undercut Mr. Davidson's testimony. Joshua Burris, Assistant Division Engineer, testified as CSXT's Rule 30(b)(6) witness. (Doc. 72 at PageID 641 (6:8–24).)[10] As an assistant division engineer, Mr. Burris "[o]versee[s] that everything is handled correctly from the track side[,]" including track inspections. (*Id.* at PageID 641 (6:15–21).)[11] He was familiar with the Drumm lead in the Ivorydale Yard, having worked there first as a craft employee and later as a manager until February 2014. (Doc. 72 at PageID 641–42 (6:25–7:5), 644 (9:12–16), 665 (30:23–25).)[12] Straightforward in his responses, he was a convincing witness.

Mr. Burris testified to the importance of controlling vegetation growth to allow for "good vision." (*Id.* at PageID 643–44 (8:8–9:11), 646–47 (11:17–12:13), 651 (16:1–10).) Part of the track inspector's "due diligence" is to ensure that the walkways are "clear." (*Id.* at PageID 649 (14:13–17).) He noted that, for the two-year period he was a manager of the Ivorydale Yard, he was "never given an exception," or complaint, with respect to the Drumm lead. (*Id.* at PageID 648 (13:3–10).) He noted also that a track inspector walked the track the day before Mr. Davidson suffered his shoulder injuries and that inspector "took no notes of . . . defect at this location." (*Id.* at PageID 661 (26:15–25).)[13] Shown photos of the Drumm lead taken shortly after Mr. Davidson was injured, Mr. Burris decisively stated that he, himself, would not have taken an exception to the track. (*Id*. at PageID 700–02 (65:17–67:7), 706–07 (71:16–72:8).)

---

Mr. Davidson included, "had complained about the track conditions or vegetation on the track to Drumm Industries" or that any employee "wanted the track at Drumm Industries to be taken out of service." (*Id.* at PageID 587 (29:13–19), 617 (59:3–19).)

[10] Like Dr. Checroun, Mr. Burris testified by video deposition.

[11] Mr. Burris explained that he is a maintenance-of-way employee (Doc. 72 at PageID 642 (7:8–18)), as opposed to a transportation employee who are the "ones that work the customers[ and] move the trains[]" (Doc. 70 at PageID 561 (3:4–12)).

[12] Mr. Burris's actual designation was "roadmaster" for the Queensgate terminal, the engineering counterpart for "trainmaster." (Doc. 70 at PageID 564 (6:15–25).) He was responsible for all track infrastructure, including the main lines in the yard and all the industrial tracks. (*Id.*)

[13] Later in his deposition, Plaintiff's counsel asked Mr. Burris to confirm a Drumm lead inspection on a track inspection report provided by CSXT. (Doc. 72 at PageID 683–88 (48:2–53:3).) Mr. Burris indicated that the report documented that the switches to Drumm Industries were inspected on October 16, 2014 and the mainline tracks were walked on September 29, 2014. (*Id.* at PageID 686–87 (51:2–52:11).) No "industry" inspections, however, were logged on this report. (*Id.* at PageID 687 (52:1–19).)

Federal regulations oblige CSXT to keep the walkways free so that employees can safely perform their trackside duties,[14] but that does not mean that *both* sides of the track must be clear. (*Id.* at PageID 662-63 (27:1–28:6), 692 (57:2–25).) As to the "rotted ties" that concerned Mr. Davidson, Mr. Burris stated that the Drumm lead is a Class 1 track,[15] and federal standards require only five "good" ties in a 40-foot section of track. (*Id.* at PageID 663 (28:7–23), 678 (43:15), 681 (46:6–8); Plaintiff's Exh. 3.)

It is undisputed that Mr. Davidson could have walked the track on October 17, 2014 instead of riding the shoving platform, ostensibly avoiding his injuries altogether. (Doc. 69 at PageID 502 (36:18–22).) Moreover, he elected not to walk despite his purported complaints to Mr. Parsons that he believed the track conditions to be unsafe. (*Id.* at PageID 533 (67:9–23) ("Q. But yet, you chose to ride it in that day anyway? A. Yes.").) The jury itself could look at the photographs and video of the Drumm lead and make its own assessment about the vegetation, which, to the Court's eye, did not appear to be overgrown. (Plaintiff's Exhs. 2–6; Joint Exhs. 2020, 2021.) Yet what may have troubled the jury the most was Mr. Davidson's failure to answer "Yes" to the question, "Did Working Conditions Cause or Contribute to the Cause of the Accident/Injury?" on his Form PI-1A.[16] (*See* Joint Exh. 2029.) Instead, he put a question mark, explaining:

> If I check Yes and put the details as it asks, I am putting down there that I reported conditions, I reported the vegetation, I reported the track conditions, which was to Mr. Parsons. **I like Mr. Parsons, he's a good guy, so I would basically be throwing him under the bus.** If I check No, I'm lying. So I checked – I just put a question mark.

---

[14] 49 C.F.R. § 213.37(c).
[15] The speed limit in the Ivorydale Yard and on the Drumm lead track is 10 miles per hour, consistent with its designation as a Class 1 track. (Doc. 69 at PageID 501 (35:15–18); Doc. 72 at PageID 663 (28:19–20), 702 (67:10–13); 49 C.F.R. § 213.9(a).
[16] CSXT Form PI-1A is titled, "Employee Injury and/or Illness Report." (Joint Exh. 2029.)

9

(Doc. 69 at PageID 510–11 (44:23–45:4) (emphasis added).)  It was not unreasonable for the jury to question this curious explanation.  Moreover, there was ample testimony that CSXT encourages its employees to report unsafe conditions to avoid accidents.  (Doc. 70 at PageID 594–95 (36:18–37:6); Doc. 72 at PageID 690–91 (55:7–56:17), 695–96 (60:21–61:25), 697–98 (62:15–63:18).)  The Court is satisfied that the clear weight of the evidence did not require a verdict more favorable to Mr. Davidson as to apportionment of fault.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff's Motion for New Trial (Docs. 67, 73) is hereby **DENIED**.

**IT IS SO ORDERED**.

Dated:  August 9, 2017                    S/Susan J . Dlott_____
                                          Judge Susan J. Dlott
                                          United States District Court